[Crim. No. 2337.   Second Appellate District, Division One.—March 15, 1933.]

In the Matter of the Application of LLOYD LARSEN ANDERSON for a Writ of Habeas Corpus.

Fred Miller for Petitioner.

John K. Hull, City Prosecutor, and Charles C. Stratton, Deputy City Prosecutor, for Respondent.

THE COURT.—The application herein for a writ of *habeas corpus* was preceded by a similar application made to the Superior Court of Los Angeles County. In ruling upon the right of petitioner to the writ for which he prayed, by a decision in an opinion prepared by Judge Walter J. Desmond of said court, the application of petitioner was denied. With the omission therefrom of the last paragraph of said opinion as filed in the superior court, and with the addition thereto of words now included within the parentheses in the paragraph thereof commencing with the words "In California the abutting property owner has title," etc., this court is satisfied with the declarations of the law therein contained. As thus modified, and as hereinafter appears,

the said opinion is adopted as the opinion of this court, to wit:

"The question involved in this case is whether the setting aside by the city of Long Beach of a portion of two public highways (Broadway and Cedar Avenue) for exclusive use as a public market from 7 A. M. till noon on Tuesday, Thursday and Saturday of each week, is a reasonable regulation of a municipal affair.

"It is contended by the petitioner, who has been fined for parking his automobile after 7 a. m. in the reserved area without a vendor's permit on Tuesday morning, December 6, 1932, that Ordinance B417, as amended by Ordinance C668, under which the market operates, is unconstitutional and void for various reasons, and particularly because the establishment and maintenance of the public market as in said ordinance provided *denies* to the public all right of travel or passage over the reserved area within the hours mentioned and during a clean-up period of one-half to one hour immediately thereafter. The petitioner also alleges that Ordinance B417 is unconstitutional and void because it is *ultra vires* and beyond any power or authority fixed in the city of Long Beach.

"At the time Ordinance B417 was adopted Long Beach was operating under a commission form of government by virtue of a charter approved by the state legislature in 1915. This instrument empowered the commissioners as the legislative body of the city 'to establish, license and regulate markets and market houses'. (Art. X, sec. 5, cl. 7, of said charter); also 'to pass ordinances upon any subject of municipal control or to carry into force or effect any other powers of the municipality' (art. X, sec. 5, cl. 33). The charter now in force, adopted in 1921, and amended at various times since then gives the city power to regulate and license any business carried on within the city. (Art. IV, sec. 33.) It is provided also that the city council shall have power to regulate street speakings or street gatherings . . . to regulate or prohibit traffic *or sales* in the streets and public places. (Art. V, sec. 44, cl. 30.) And the council is empowered to establish, license and regulate public markets and market houses. (Art. V, sec. 44, cl. 7.)

" 'The Director of public service is given, as one of his duties, the management of public markets and market

houses.' (Art. XIX, sec. 212.) 'The city has "the right and power to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in this charter," ' etc. (Art. IV, sec. 2.)

"In *Bank* v. *Bell*, 62 Cal. App. 320 [217 Pac. 538], the right of the city of Berkeley to establish and maintain a public market was sustained in an exhaustive opinion written by Judge St. Sure, now on the federal bench, on the ground that such action related to a municipal affair, over which the city had exclusive and complete power under the terms of its charter. The reasoning and language of that decision seem altogether applicable to the situation in Long Beach, so far as the right of the city to establish and maintain a public market is concerned, but the right of the city to maintain such a market in a public street under the conditions here involved was not before the court.

"A public market has been conducted under the control of the city of Long Beach in streets next to Lincoln Park from a time antedating Ordinance B417 by five or six years. So, we have to do here with an institution of a public nature that has operated continuously for approximately twenty years, and it is to be noted that there is no complaint now before the court by an abutting property owner that the market is a nuisance to him or detrimental or offensive to the conduct of his business. In fact, we could have in this particular case no objecting abutting property owner, for at the point where petitioner parked his car on the morning of December 6, 1932, the land on both sides of the street is owned by the city of Long Beach.

"In California the abutting property owner has (or may have) title to the fee of the land to the middle of the street, subject to the easement permitting the public to travel over it. The courts everywhere have been vigilant to protect this easement belonging to the public, although agreeing that the landowner may make any use of the fee not inconsistent with the public right. Although the city of Long Beach owns the fee of the entire street known as Broadway at this point, no attempt has been made to close this highway to travel, a space considerably less than one-half the width of the roadway being set apart for the public stalls, permitting the movement of vehicles at all times in both direc-

tions over the balance of the thoroughfare. The same condition obtains on Cedar avenue, where the city, owning Lincoln Park, owns to the center of the street, subject to public easement. While the traffic undoubtedly is slowed down in these areas at the market hours, it is by no means prohibited. Considering the great convenience afforded the public, both producer and consumer, in carrying on this traffic in the restricted area set apart by the city, immediately adjoining city property; also considering the fact that the city has fixed its permit fees according to a schedule that precludes any idea of profit being derived from the market, it seems to this court that Ordinance B417 as amended is a reasonable and valid regulation of a municipal affair by proper municipal authority acting under adequate charter powers.

"An interesting case that has come to our attention is *Commonwealth* v. *Morrison*, 197 Mass. 199 [83 N. E. 415, 14 L. R. A. (N. S.) 194], extensively annotated in 125 Am. St. Rep. 338. In this case the proprietor of a lunch stand, stationed during certain hours of the night, in the public highway, failed to secure a reversal of his conviction. In the interesting discussion of highways Justice Rugg, author of the opinion and now Chief Justice of the Supreme Judicial Court of Massachusetts, has this to say:

" 'The public acquire by the location of a highway an easement of passage, with all the powers and privileges, which are necessarily implied as incidental to the exercise of this right. The easement is coextensive with the limits of the highway. The fee of the land remains in the landowner, who may make any use of it not inconsistent with the paramount right acquired by the public. The easement which the public acquires includes every reasonable means of transportation for persons, and commodities, and of transmission of intelligence which the advance of civilization may render suitable for a highway. Under this description of the character of rights acquired by the public, gas and water pipes, sewer, telephone, telegraph, electric light and power poles, wires and conduits, electric and horse railways, the Boston subway and private railroads have been permitted. (Citing authorities.) But, notwithstanding these various instrumentalities, they are all manifestations in divers forms of the right of travel of persons, the transmission of intelligence and the transportation of commodities. The primary

purpose of a highway is the passing and repassing of the public, which is entitled so far as needed to the full, unobstructed and uninterrupted enjoyment of the entire width of the layout for that purpose. Whenever the public does not have occasion to exercise its easement to its full extent, the owner of the fee may make any use not inconsistent with the easement of the public. Whatever interferes with the exercise of this easement is a nuisance. (Citing authorities.) The stands of hackney carriages may perhaps be justified as a phase of public travel (*Com.* v. *Matthews,* 122 Mass. 60), and the use of streets in connection with markets, in view of long-continued customs in Boston and perhaps elsewhere in this commonwealth, as incidental to the transportation of merchandise (*Com.* v. *Brooks,* 190 Mass. 355), and possibly also in connection with the establishment of a public market. (*Spaulding* v. *Lowell,* 23 Pick. [Mass.] 71; *Kinney* v. *Robison,* 49 Mich. 249 [13 N. W. 610].)'

''To one who observes the conduct of the municipal market in Long Beach it is at once apparent that the use of that reserved area of the streets is 'incidental to the transportation of merchandise' in large quantities, and while the local street market is young indeed in comparison with the Eutaw St. Market in Baltimore, the Central Market in Washington, and Fanueil Hall Market in Boston, we think it may be said, having operated for approximately twenty years, to have attained the status of 'a long-continued custom'. We also feel that it was established and is maintained legally under Ordinance B417 as amended; therefore that the writ should be discharged and the petitioner remanded, and it is so ordered.''

It is ordered that the writ hereinbefore issued be and the same is discharged, and the petitioner is remanded to custody.